IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL SHANE WILMOTH                                               PLAINTIFF

v.                               CASE NO. 5:16-CV-5244

INTERIM SHERIFF MEYER GILBERT,
Benton County, Arkansas; LIEUTENANT
JESUS MARTINEZ; SERGEANT MICHAEL
V. LIRA; DEPUTY AUSTIN MURPHY;
CORPORAL KEMP; SERGEANT DOWYER;
MAJOR JEREMY GUYLL; NURSE SHEA SMITH;
DR. ROBERTO SAEZ; and NURSE TYRANNY RAY          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This is a civil rights action brought by the Plaintiff pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Although Plaintiff is currently incarcerated in the East Arkansas Regional Unit of the Arkansas Department of Correction (ADC), the events at issue in this case occurred while he was incarcerated in the Benton County Detention Center (BCDC).[1] Plaintiff contends that, during his incarceration at the BCDC, his constitutional rights were violated in the following ways: (1) he was denied adequate medical and mental health care; (2) excessive force was used against him; and (3) he was subjected to disciplinary action based on falsified documents and given an excessive punishment.

---

[1] Plaintiff was incarcerated at the BCDC from July 6, 2016, until November 21, 2016. For part of this incarceration, he was a pretrial detainee. The Court takes this point up below when considering the County Defendants' Motion for Summary Judgment.

The case is before the Court on two Motions for Summary Judgment. The first Motion for Summary Judgment (Doc. 49) was filed by Separate Defendants Dr. Roberto Saez, Nurse Tyranny Ray, and Nurse Shea Smith (collectively, "Medical Defendants"). The second Motion for Summary Judgment (Doc. 52) was filed by Separate Defendants Sheriff Meyer Gilbert, Lieutenant Jesus Martinez, Sergeant Michael V. Lira, Deputy Austin Murphy, Corporal Kemp, Sergeant Dowyer, and Major Jeremy Guyll (collectively, "County Defendants"). Plaintiff has responded (Doc. 81) to both Motions and they are now ripe for decision.[2] For the reasons stated herein, the Medical Defendants' Motion for Summary Judgment (Doc. 49) is **GRANTED**, and the County Defendants' Motion for Summary Judgment (Doc. 52) is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Because the instant Motions are one for summary judgment, the Court will recite the facts in the light most favorable to Wilmoth, the non-moving party, and will limit its discussion only to what is necessary to provide context for the Court's decision. In

---

[2] In his statement of disputed facts contained in Document 81, Plaintiff argues that Defendants have withheld discovery from him. However, the Court has ruled on all pending motions to compel. Plaintiff also indicates he has not been provided with the videos submitted by Defendants with the summary judgment materials. Plaintiff never asked for a Court order allowing him to view the videos. ADC inmates are not generally allowed to have DVDs for security reasons. In fact, Plaintiff states that the Assistant Warden told him in late June of 2017 that the DVDs had been mailed back to Defendants' law firm. (Doc. 81-5, p. 2). Furthermore, Plaintiff has submitted an affidavit in which he indicates that he has seen the video from August 11, 2016, but states that it does not cover the period after the altercation when he was being led to E-pod (*Id.* at 1). Plaintiff also states that he was unable to obtain affidavits from deputies who were witnesses or from inmates including ADC inmates. Plaintiff could have written the deputies care of the BCDC. With respect to inmates, Plaintiff did not file a motion asking for permission to write ADC inmates or inmates of other facilities. Having not taken the steps necessary to accomplish these steps, Plaintiff cannot now avoid summary judgment on this basis. Plaintiff filed his response nearly four months after the summary judgment motions were filed and after having obtained several extensions of time.

addition, because the two Motions deal with very different sets of facts, the Court will recite the most pertinent facts in two separate sections. Finally, because the sequencing of events is of considerable importance to certain of Plaintiff's claims, in each section, the Court will recount events chronologically.

## A. Facts with respect to the Medical Defendants

Dr. Roberto Saez is a physician who, at all times relevant to this lawsuit, was under contract with Southern Health Partners, Inc. ("SHP"), to provide medical services to inmates housed at the BCDC. (Doc. 50-1, p. 1). Tyranny Ray and Shea Smith are nurses who were similarly employed by SHP to provide medical services for inmates housed at the BCDC. (Doc. 50-2, pp. 1, 4).

Plaintiff was booked into the BCDC on July 6, 2016. (Doc. 54-2, p. 1). A mental health screening form was completed on that same day. (Doc. 54-3, p. 2). Plaintiff indicated he was receiving care at Dayspring Behavioral Health and was currently taking Plaquenil, Trazodone, and Klonopin. *Id.* at 2, 3 (spelling corrected).[3]

According to Nurse Ray, she saw the Plaintiff on July 7, 2016, to conduct his intake screening, but Plaintiff refused to be screened and refused to sign a consent for treatment form. (Doc. 50-2, p. 2; Doc. 50-3, pp. 2, 3). Plaintiff denies that he refused to be screened and/or refused to sign a consent to treatment form. (Doc. 81, p. 3). Further, he states that he never saw or talked to Nurse Ray on July 7, 2016. *Id.* at 4. However, at some point, it is undisputed that Plaintiff told Nurse Ray that he was taking "home

---

[3] At his deposition, he testified he was not sure if he had the name of the medication he was taking for a skin disorder, but the third drug he put down should have been Plaquenil (hydroxychloroquine). (Doc. 54-7, pp. 23-24).

medications" and, as a result, Nurse Ray contacted his family to have his medications brought to the BCDC. (Doc. 50-2, p. 2).

On July 18, 2016, Plaintiff submitted his first medical request via the electronic kiosk system. (Doc. 50-2 at 2; Doc. 50-4, p. 1). In the request, Plaintiff stated he had been contacted by his doctors and they needed him to sign a medical authorization for release of his records. In addition, he mentioned that his family had dropped off some medications, but he had not yet received them. (Doc. 50-4, p. 1). The very next day, Nurse Ray, responding to his message, advised Plaintiff that the only medication dropped off was Plaquenil, asked what he was taking that for, and stated that he had not been given Plaquenil because the discontinue date on the medication was May 15, 2016. *Id.* Plaintiff responded that he was taking the Plaquenil for a skin condition. (Doc 50-2, p. 2; Doc. 54-4, p. 2).

On July 19, 2016, Plaintiff indicated he had not refused an inmate visit and had never even been called for a medical visit. (Doc. 54-4, p. 3). Nurse Ray responded: "addressed." *Id.*; *see also* (Doc. 54-7, p. 32). That same day, Dr. Saez ordered that Plaintiff be continued on Plaquenil for his skin condition. (Doc. 50-1, p. 1).

On July 20, 2016, Plaintiff submitted a kiosk entry thanking Nurse Ray for her help in addressing his issues and asking if she could obtain his records from Ozark Guidance. (Doc. 50-4, p. 2). She responded that she was working on it. *Id.* The Ozark Guidance records subsequently obtained indicate that Plaintiff had been diagnosed with Intermittent Explosive Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, and Unspecified Bipolar Disorder. (Doc. 54-3, p. 1). When he is not on his mental health medication, Plaintiff testified he is "highly explosive" and "quick tempered." (Doc. 54-7, p. 13).

4

On July 21, 2016, Plaintiff asked when he would be placed back on his mental health medications. (Doc. 50-2, p. 2; Doc. 50-4, p. 4). Nurse Ray responded that she was waiting for his mother to bring the medications to the BCDC so that she could verify them. (Doc. 50-4, p. 4).

On July 22, 2016, Plaintiff submitted a medical request stating that, prior to his incarceration, he had been seen at Daysprings and prescribed Lithium. (Doc. 50-2, p. 3; Doc. 50-4, p. 5). However, the doctor would not start him on Lithium without having blood tests performed first.[4] (Doc. 50-4, p. 5). Plaintiff had not had his blood collected prior to being booked in. (Doc. 50-2, p. 3).

On July 25, 2016, Plaintiff asked again about his mental health medications, stating his mental state had "gotten extremely worse I need my meds very bad." (Doc. 50-4, p. 6). Nurse Ray again responded that she was waiting for his mother to bring in the medications. *Id.* Plaintiff stated that he and his family had to do a lot of work within the first couple of weeks of his incarceration to get his medications and his records brought up to the BCDC. (Doc. 54-7, pp. 33-34).

On July 26, 2016, Plaintiff submitted a request stating that Ozarks Community Hospital (OCH) in Gravette, Arkansas, would not allow his mother to pick up his medications without a signed release. (Doc. 50-2, p. 3; Doc. 50-4, p. 7). He signed the release the next day. (Doc. 50-2, p. 3; Doc. 50-3, p. 5). The OCH records indicated Plaintiff had been on Klonopin for anxiety and Oxycodone for right ankle pain. (Doc. 50-2, p. 3; Doc. 50-3, p. 6).

---

[4] In his response, Plaintiff states he told medical staff on July 6, 2016, that he needed blood work done. (Doc. 81, p. 6).

On July 27, 2016, Dr. Saez started Plaintiff on Trazodone, 50 mg., for anxiety and depression.[5] (Doc. 50-1 at 1). Plaintiff submitted a medical request stating that his family had been told that medical staff could help get him transferred to a "mental hospital" and asking how they got this accomplished (Doc. 81-1, p. 11). Nurse Ray responded that the judge and attorneys were the ones responsible for doing that and that medical staff had no authority to transfer an inmate to a mental hospital. *Id*. Plaintiff submitted a second request on July 27, 2016, stating that his "free world doctor gave m[e] traz[o]done to be taken at night." (Doc. 81-1, p. 12). He said taking it in the morning would be more than he could handle if he was forced to stay out of his cell. *Id*. If the medication was going to be given in the morning, he said he should be placed in a medical cell. *Id*. Nurse Ray responded: "addressed." *Id*.

On July 28, 2016, the Trazodone was discontinued. (Doc. 50-1, p. 1). Plaintiff testified that the Medical Defendants would only prescribe Trazodone so that it was taken in the morning. (Doc. 54-7, p. 21). He indicated that this would make him "severely sleepy—almost unconscious to a point." *Id*. In short, he testified that there was "no way [he] could take it in the morning and function." *Id*. He maintains the medication should have been prescribed in accordance with his private doctor's orders. (Doc. 81, p. 6). He also states he never had depression. *Id*. However, Plaintiff's own exhibit

---

[5] Plaintiff states that his private doctor prescribed Trazodone to help him sleep, and not for anxiety or depression, which is why he took the medication in the evening. (Doc. 81, p. 6). However, Trazodone is a medication that is used to treat depression. https://medicineplus.gov/druginfo/meds/a681038.html (accessed January 30, 2018).

indicates he reported being very depressed at times when seen at Ozark Guidance on February 4, 2016. (Doc. 81-2, p. 2).[6]

That same day, Plaintiff's blood was collected and sent to Quest Diagnostics for testing. (Doc. 50-1, p. 1). The results were faxed to the BCDC on July 29, 2016. (Doc. 50-3, pp. 7-8).

On August 1, 2016, Plaintiff submitted a request asking about his mental health medications. (Doc. 50-2, p. 3). He said his medication was not being given to him as prescribed by his doctor and his "mental health is getting extremely worse" (Doc. 50-4, p. 8). On August 2, 2016, Plaintiff submitted another request stating that the "issue needs addressed as soon as possible my mental health condition is getting extremely worse." *Id.* Nurse Ray replied that she had sent the blood work results to Daysprings but had not heard back from them. (Doc. 50-2, p. 3; Doc. 50-4, p. 8). Nurse Ray asked him if he wanted to be seen by the jail doctor, and Plaintiff was subsequently placed on the doctor call list. (Doc. 50-2, p. 3).

On August 4, 2016, Plaintiff asked to see Ms. Susan, of social services, regarding his mental health needs. (Doc. 81-1, p. 15). Nurse Ray replied that she had given the request to Susan. *Id.* On August 8, 2016, Plaintiff submitted a request for Ms. Susan asking that she let him know what she found out. (Doc. 81-1 at 16). He also stated that there was a supplemental security income issue that he forgot to talk to her about. *Id.* Again, his request was given to Susan. *Id.*

---

[6] Further, bipolar disorder is characterized by changes in mood, energy, and activity levels including manic episodes when the individual is extremely "up" and depressive episodes when the individual is sad, down, or has hopeless periods. https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (accessed January 30, 2018).

7

On August 11, 2016, Plaintiff asked when he would be seeing the doctor. (Doc. 81-1, p. 18). He stated he was "on the verge of having a major mental break down." *Id.* In response, Nurse Ray stated he would be seeing the doctor the next day. *Id.*

Plaintiff testified that during his disciplinary hearing[7] on August 12, 2016, Lieutenant Martinez could tell Plaintiff was having severe mental health issues. (Doc. 54-7, p. 37). Plaintiff testified he was edgy, experiencing anxiety, and appeared to be aggressive when he was just trying to convey his thoughts. *Id.* at 38. He also testified that he uses his hands a lot when he talks and gets loud and boisterous. When Plaintiff advised that he was not currently on mental health medication, he testified that Lieutenant Martinez said they needed to fix that and went straight to the doctor's office. *Id.* at 37.

On August 12, 2016, Dr. Saez saw the Plaintiff at doctor call. (Doc. 50-1, p. 2). Dr. Saez reviewed Plaintiff's blood test results from Quest Diagnostics. *Id.* Dr. Saez started Plaintiff on Lithium which is used for the treatment of manic episodes of bipolar disorder. *Id.*; *see also* Doc. 50-3, p. 11. That same day, Plaintiff was also started on Ibuprofen twice a day, for a week, for pain resulting from a physical altercation. (Doc. 50-1, p. 2; Doc. 50-3, p. 9).

On August 13, 2016, Plaintiff said he really needed to speak with Nurse Ray about his medication. (Doc. 81-1, p. 20). Nurse Ray responded: "duplicate." *Id.*

The next day, Plaintiff submitted a request complaining of severe headaches, his jaw hurting, and having problems with his medication. (Doc. 81-1, p. 21). Nurse

---

[7] This disciplinary hearing is connected to the Motion for Summary Judgment submitted by the County Defendants and is discussed below.

Jakovich responded that Plaintiff was already on Ibuprofen and had not been on the new medication long enough for it to be effective. *Id.*

On August 15, 2016, Plaintiff said it was very important he saw Nurse Ray about his medication and that the request was not a copy. (Doc. 50-4, p. 9). Plaintiff complained of an allergic reaction to the Lithium. *Id.* He stated his lips and throat were swollen and also complained of headaches. *Id.* Nurse Ray saw Plaintiff on August 16, 2016. (Doc. 81-1, p. 22).

On August 17, 2016, Plaintiff's Lithium prescription was discontinued because of Plaintiff's report of having an allergic reaction to it. (Doc. 50-1 at 2). On August 18, 2016, Plaintiff submitted a request stating he needed to see the doctor. (Doc. 81-1, p. 23). Nurse Ray asked what he needed to see the doctor about. *Id.* Plaintiff replied that his skin was getting worse and he needed something for his mental health. *Id.* at 24. Nurse Ray responded that he would be put on the list. *Id.*

On August 20, 2016, Plaintiff submitted a medical request stating that his emotions went from one extreme to the other and he was losing massive amounts of weight. (Doc. 54-4, p. 16). He stated he did not care about the reaction he had to Lithium and that he needed something. *Id.* That same day, Plaintiff submitted a medical request saying he had not had a migraine for two years until the incident on August 12, 2016, and was now having them constantly. *Id.* at 17.

On August 21, 2016, he submitted another request saying he did not want to get in more trouble than he was already in and to just put him back on Lithium. (Doc. 54-4, p. 16). Nurse Ray replied that Dr. Saez had ordered another medication, Zyprexa (olanzapine), for him to try and that he would begin receiving it the following day. *Id.*

On August 22, 2016, Plaintiff was prescribed Zyprexa as a mental health medication.[8] (Doc. 50-1, p. 2; Doc. 50-3, p. 10). On August 26, Plaintiff complained of mood swings. (Doc. 50-1, p. 2). As a result, the Zyprexa dosage was increased to 7.5 mg. *Id.*

On August 28, 2016, Plaintiff complained he was still having migraines over his left eye and that his jaw hurt. (Doc. 50-4, p.10). He stated that the doctor had told him that he would get Plaintiff taken care of but nothing was done. *Id.* Nurse Ray asked if he would like some Ibuprofen and he responded yes. *Id.* On August 29, 2016, Dr. Saez prescribed Ibuprofen, 600 mg., twice a day for ten days. (Doc. 50-1, p. 2; Doc. 50-3, p. 10).

On September 3, 2016, Plaintiff submitted a request asking if his skin cream had ever been brought to the jail. (Doc. 81-1, p. 32). In response, he was told Nurse Ray would be asked to check on it Monday. *Id.*

The following day, Plaintiff submitted a medical request stating he still had a knot on his head from the incident on August 12, 2016, was having severe migraines over his left eye, and his jaw still hurt "extremely bad." (Doc. 54-4, p. 19). In a second request submitted that day, Plaintiff stated he was still having some anxiety and panic attacks, could not sleep well, and still had some mood changes. *Id.* Nurse Ray responded: "ok." *Id.*

On September 9, 2016, Plaintiff again complained of headache and jaw pain. (Doc. 50-1, p. 2). His Zyprexa dosage was increased to 10 mg. and he was started on a

---

[8] Zyprexa is used to treat mental disorders, including bipolar disorder. *See, e.g.*, Doc. 50-1, p. 2.

muscle relaxer, Flexeril, 10 mg., twice a day for seven days, and given Ibuprofen, 600 mg., twice a day for fourteen days. *Id.*; *see also* Doc. 50-3, pp. 10, 12.

On September 13, 2016, Plaintiff submitted a request asking the names of the medications he was taking and in what dosage. (Doc. 81-1, p. 34). He also stated the doctor had said he was increasing his dosage but it appeared he was still getting 7.5 mg. pills. *Id.* Nurse Ray responded that he was receiving: hydroxychloroquine (Plaquenil) 200 mg., twice a day; cyclobenzaprine (Flexeril) 10 mg., twice a day; olanzapine (Zyprexa) 10 mg., once a day; and Ibuprofen, 600 mg., twice a day. *Id.*

On September 15, 2016, Plaintiff submitted a request advising Nurse Ray that one of his creams that had been brought to the jail was trashed. (Doc. 81-1, p. 35). Plaintiff said he had told the doctor it was almost empty and the doctor said he would reorder it along with an order for Plaintiff's shampoo. *Id.* Plaintiff states the nurse then said he would not get the shampoo. *Id.* Plaintiff asked why it could not be placed on the med cart and he could fill his small bottle when he needed to. *Id.* Nurse Ray responded: "ok." *Id.*

On September 25, 2016, Plaintiff submitted a request saying he needed his Ibuprofen reordered because he was still having headaches and his jaw was still hurting. (Doc. 81-1, p. 36). Nurse Ray responded that his current prescription had expired and that he would need to talk to the doctor. *Id.* That same day, Plaintiff submitted a request asking whether his cream that had been thrown in the trash was being reordered. *Id.* at 37. Nurse Ray responded: "ok." *Id.*

On September 28, 2016, Plaintiff submitted a request stating he needed to see the doctor. (Doc. 81-1, p. 39). Nurse Ray asked what the reason was. *Id.*

On October 10, 2016, Plaintiff submitted a request stating he had two seizures on the previous Friday and Saturday. (Doc. 50-2, p. 4; Doc. 50-4, p. 11). He also stated he was still having migraines and his jaw still hurt. (Doc. 50-4, pp. 11-12). Nurse Ray evaluated Plaintiff at nurse call on October 11, 2016. (Doc. 50-4, p. 12). Plaintiff reported a history of seizures but stated he had not taken Dilantin, an anti-epileptic medication, since December of 2015. (Doc. 50-2, p. 4; Doc. 50-4, p. 12). Plaintiff was placed on the doctor list. *Id.* Dr. Saez saw Plaintiff again on October 14, 2016, when he stated he had two seizures. Dr. Saez noted that the seizures had not been witnessed by anyone and gave no new orders. (Doc. 50-1, p. 2).

On October 16, 2016, Plaintiff submitted a grievance stating that he was being denied medical attention for an injury caused by a deputy. (Doc. 54-4, p. 21). Lieutenant Holt replied that all medical decisions were made by medical staff. *Id.* He forwarded the grievance to medical staff. *Id.* Nurse Ray asked him how he was being denied medical attention. *Id.*

On October 24, 2016, Plaintiff submitted a request saying he was feeling shaky between meals and felt like he was going to pass out. (Doc. 81-1, p. 43). He was seen by Nurse Ray on October 26, 2016. *Id.*

Plaintiff asserts that the care given by the Medical Defendants during his incarceration at the BCDC was deficient in numerous ways. With respect to Dr. Saez, Plaintiff testified that Dr. Saez said he did not believe the Plaintiff had seizures and refused to treat him for them. (Doc. 50-5, p. 2; Doc. 54-7, p. 49). Even after the nurse documented his history of seizures, Plaintiff indicated the doctor refused to treat him. (Doc. 54-7, p. 49). Plaintiff also believes Dr. Saez should have either prescribed him Klonopin or at least weaned him off of it, or given him something for the side effects.

(Doc. 54-7, p. 45). Plaintiff testified as a result of the medication being stopped abruptly he suffered withdrawal, was sick to his stomach, had a headache, and suffered from severe anxiety. *Id.* The symptoms lasted about a week or week and a half. *Id.* Plaintiff also testified Dr. Saez refused to allow him to take his Trazodone in the evening. *Id.* at 49.

With respect to Nurse Ray and Nurse Smith, Plaintiff contends they should never have let the guard issue him his medications. (Doc. 54-7, pp. 46-47, 50, 95). Plaintiff testified that for nearly the entire month that he was in red and white stripes,[9] the guards brought him his medication. (*Id.* at 47-48). He also did not believe Nurse Ray followed up on his mental health medications in a timely manner and did not have him seen. (Doc. 50-5, p. 2). With respect to his official capacity claims, Plaintiff testified that he did not at that time know what policy, custom, or practice violated his constitutional rights, but he stated that he had requested copies of the policies and had not received them yet. *Id.*

The Medical Defendants deny being deliberately indifferent to Plaintiff's medical needs. By affidavit, Dr. Saez states he "used sound professional judgment when [he] prescribed medications for [Plaintiff's] various medical and mental health needs." (Doc. 50-1, p. 3). Dr. Saez states he provided Plaintiff with "appropriate and timely care, and I met or exceeded all applicable standards of care." *Id.* Dr. Saez asserts that he was not deliberately indifferent to Plaintiff's serious medical needs. *Id.* By affidavit, Nurse Ray

---

[9] The red and white stripes indicate the inmate attempted to, or assaulted, an officer. *See* Doc. 54-7, p. 48.

states that Plaintiff was considered a safety risk to the healthcare staff. (Doc. 50-2, p. 4). With respect to medication being passed out, Nurse Ray states:

> [b]ecause Plaintiff was considered a safety risk, correction officer accompanied nurses while passing medications to Plaintiff. The nurses handed the medications to the correction officer, who passed the medications to Plaintiff through the "beanhole" in the cell door. At no time did a correction officer pass medications to Plaintiff without a nurse present.

*Id.*

Nurse Ray asserts that neither she nor Nurse Smith were deliberately indifferent to Plaintiff's serious medical needs. (Doc 50-2, p. 4). Nurse Ray also asserts that she and Nurse Smith provided Plaintiff with "appropriate and timely nursing care." *Id.* at 5. Further, both Dr. Saez and Nurse Ray assert that no policy or custom of SHP was unconstitutional, or exhibited deliberate indifference to Plaintiff's serious medical needs. *Id.; see also* Doc. 50-1, p. 3.

### B. Facts with respect to the County Defendants

Plaintiff was booked into the BCDC on July 6, 2016, after being arrested on a parole violation charge. (Doc. 54-2, pp. 1-2). He was also charged by the Bella Vista Police Department with domestic battery, assault on a family or household member, and terroristic threatening. *Id.* at 3. On July 26, 2016, additional charges of tampering and violation of a no contact order were added. *Id.* at 13. On August 17, 2016, a parole revocation hearing was held and Plaintiff was found guilty of violating the terms of his

parole.[10] *Id.* at 15-16. As a result, he was a pretrial detainee during the two incidents that form the backdrop of his claims against the County Defendants.

### 1. Incident on August 11, 2016

On August 11, 2016, there was an altercation in the pod control area. (*Cnty. Defs.' Ex.* B (conventionally filed DVD)).[11] The video shows Plaintiff coming out of the pod door into the pod control area. There are three officers present in addition to the officer standing in the elevated control area. Plaintiff stands with his arms behind his back against the pod windows. He is directed to the half wall surrounding the control area and puts his forehead against the wall and stands with his hands behind his back. When he begins talking, he moves his head from the wall, and starts shaking his head and looking from one side to another. He turns partially towards one of the officers and then turns back to face the wall. Then, he takes his hands from behind his back and talks in an agitated manner. When one officer moves towards Plaintiff with a pair of handcuffs, Plaintiff quickly turns towards the officer and throws his hands up in the air. He is quickly taken to the floor. One officer is on top of him and two officers help hold him down. One officer attempts to get handcuffs on the Plaintiff. A fourth officer responds and attempts to hold the Plaintiff's legs. Four more officers respond. The, the officer who had been on top of the Plaintiff stands him up and puts him against the half wall. Plaintiff is then escorted from the area visible to the camera.

Deputy Murphy wrote the following incident report about the events of that day:

---

[10] Plaintiff was released from the BCDC on November 21, 2016. (Doc. 54-2, p. 17).

[11] Neither video submitted as exhibits contains audio.

On August 11, 2016, I, Deputy Murphy was assigned to D Pod. I was helping the nurse on duty pass out medication. At approximately 1917 hours an inmate walked up to the pod door of D153 saying "ya'll got me f---ed up" and "I'm gonna fight a motherf---er." The inmate was later identified as Wilmoth, Michael (OCA#21246), I ordered Inmate Wilmoth to come out of D153, place his hands behind his back and face the wall at pod control. He complied. Inmate Wilmoth continued yelling and cursing at us about how a Deputy took his pictures out of his cell during the shakedown and he was going to fight us. Due to his comments about fighting us and his aggressive attitude, Deputy Carter told Inmate Wilmoth that he was going to place Wilmoth into handcuffs. Wilmoth then responded with "the f--- you are" and aggressively turned off the wall toward Deputy Carter. At that time I recognized the threat and placed Inmate Wilmoth on the ground. I stayed on top of Inmate Wilmoth, while trying to take control of Inmate Wilmoth I told him I was not going to get off of him until he quit resisting. Deputies Carter and Bailey were able to gain control of Inmate Wilmoth's arms and handcuff him. I then assisted Inmate Wilmoth to his feet and Corporal Kemp escorted Inmate Wilmoth to E Pod to be rehoused. Inmate Wilmoth is being locked down, pending a hearing, for the infractions of B5 (Refusal to obey an order), B6 (Interference with jail operations) and C17 (Disruptive conduct).

(Doc. 54-5, p. 1). In Deputy Carter's supplement to the incident report, he indicated that

Wilmoth "turned around aggressively getting ready to punch me." *Id.*

During his deposition, Plaintiff confirmed that the April 11, 2016, incident started

when they shook down the barracks and took all his photographs of his family. (Doc. 54-

7, pp. 51-52). He had nine photographs and the officers said he was only supposed to

have five. *Id.* Instead of leaving him with five photographs, they took them all. *Id.*

Plaintiff testified he went to the pod door and asked to be seen. (Doc. 54-7, p.

53). He was called out to pod control and told to put his head against the half wall with

his hands behind his back. *Id.* at 53-54. Plaintiff testified he was very agitated, was

cussing, and was probably louder than he should have been. He told them someone

was going to give him his pictures back. The officers responded that he was only

supposed to have five pictures and he replied fine, but someone needs to give me five pictures back. *Id.* at 54-55.

Plaintiff testified that the officers were telling him to calm down. (Doc. 54-7, p. 55). Plaintiff had taken his hands from behind his back and he was told to keep them behind his back. *Id.* However, because Plaintiff talked with his hands a lot, he testified that it was hard for him to keep them behind his back. *Id.*

Plaintiff stated that when Deputy Carter said he was going to put him in handcuffs[12] he turned to face Deputy Carter. *Id.* Plaintiff testified that when he turned towards Deputy Carter he was merely trying to talk to him and was not trying to be aggressive. *Id.* at 39, 55. He said his mental health issues kept him from calming down. Among other things, Plaintiff indicated he was agitated, talking with his hands and forgetting to keep them behind his back, was getting loud and boisterous, getting on edge, and using offensive language. *Id.* at 39-40. Plaintiff recalled saying something like "[y]ou're not going to put me in handcuffs so you can beat me." *Id.* at 56. This was when he was taken to the floor and put in handcuffs. *Id.* Plaintiff testified: "[Deputy] Murphy proceeded to smash my head in the floor and tell me how he was going to beat my a-- in my ear. He kept putting his elbow on the back of my head . . . . He got very aggressive." *Id.* After he was picked up and was being escorted into the other hallway, Plaintiff indicated Deputy Murphy continued to be aggressive, yelling at him, getting in his face, and telling the Sergeant that Plaintiff had swung on him. *Id.* at 56-57. Plaintiff testified he was not even facing Deputy Murphy and did not swing on him. *Id.* at 57.

[12] Plaintiff stated during his deposition that Deputy Carter told him "I would like to put you in handcuffs for your own safety and ours." (Doc. 54-7, p. 55).

Plaintiff asked Sergeant Dowyer to review the video. *Id.* at 60-61. Plaintiff was put in lock down and was told he was going to be written a disciplinary. (Doc. 54-7, p. 58).[13]

## 2. Incident on August 12, 2016

On August 12, 2016, there was an altercation in Plaintiff's cell. (*Cnty. Defs.' Ex.* C (conventionally filed DVD)). Video of the altercation provides two camera angles showing Plaintiff's pod. Three officers walk up the stairs to the top tier of the pod, approach Plaintiff's cell, and open the door. All three officers then enter the cell. What occurs inside the cell is outside the range of the camera. Two officers then exit but then very quickly re-enter the cell. A fourth officer comes up the stairs and enters the cell. Eleven more officers go up the stairs and head towards the Plaintiff's cell. Several more officers then enter Plaintiff's cell while the remaining officers gather outside the door. The officers slowly begin exiting the cell and going back downstairs.

Deputy Murphy's incident report provides as follows:

> At approximately 0500 hours Deputies Carter, Cruz and I went into the cell of Inmate Wilmoth, Michael (OCA#21246) to serve him from an event that happened on August 11, 2016. . . . Upon entering cell E229, I ordered Inmate Wilmoth to have a seat at the desk with his legs placed under the desk to go over paperwork. Inmate Wilmoth complied. I began to serve Inmate Wilmoth and he said he didn't want to sign them. Inmate Wilmoth began to get verbally aggressive, so Deputies Carter, Cruz and I began to exit the cell. I told Inmate Wilmoth to stay seated until we left the cell and he continued to scream at us. Inmate Wilmoth jumped up from his desk and charged me while I was at the door of his cell. Inmate Wilmoth was able to punch me in the right side of my face. I was able to gain control of Inmate Wilmoth's upper body and took Inmate Wilmoth to the floor and attempted to gain control of him. Deputies Carter and Cruz gained control of his arms. Deputy Carter called "Assistance Echo" at 0504 on the radio and placed Inmate Wilmoth into handcuffs. We secured Inmate Wilmoth

---

[13] Plaintiff indicated he was told his property would be brought to him but it never was. (Doc. 54-7, p. 58).

on the floor until backup deputies arrived. When deputies arrived I was relieved from the situation to go to the nurse to be medically cleared. Inmate Wilmoth is being locked down, pending a hearing, for infractions of A4 (Assault and Battery or accessory to Battery or Extortion) and B5 (refusal to obey an order).

(Doc. 54-5, p. 3). Deputy Cruz and Deputy Carter submitted supplements to this report. *Id.* at 3-4. The papers presented also contained the disciplinary charges from the August 11, 2016, incident and a commissary inventory. *Id.* at 5, 8.

According to Plaintiff, Deputies Carter, Murphy, and Cruz entered his cell, woke him up, told him to sit at the table with his hands on the table. (Doc. 54-7, p. 68). They gave him a property form and because it did not list all his property, Plaintiff did not sign it.[14] Plaintiff did not believe they presented him with his disciplinary notice at this time as he recalled the disciplinary notice being served on him through the door. Plaintiff testified that at that point, Deputies Cruz and Carter exited the cell. (Doc. 54-7, p. 68). Deputy Murphy proceeded to leave the room. *Id.* Plaintiff stood up and was told to sit back down at the table. *Id.* Plaintiff testified that since Deputy Murphy was already out of the cell and closing the door, he replied "f--- you" or something to that effect and also called him a "dick sucker." *Id.* at 69.

According to Plaintiff, Deputy Murphy then:

opened the door up, rushed into the cell, hit me in my face with a closed fist. I dropped to my knees. He proceeded to punch me in my face. I went to the floor and covered up my head with my hands. He proceeded to punch me in the back of the head and the side of the face repeatedly while I'm laying on the ground. . . . [W]hile he's punching me in the head, he's told me that, if I wanted to act like a b----, he's going to treat me like a b---- and that he was going to f--- me like a b----."

[14] Plaintiff testified that his property was re-inventoried and he was presented with a new property form a couple of weeks later which he did sign. (Doc. 54-7, p. 86).

(Doc. 54-7, pp. 69-70) (alterations made to obscenities). Plaintiff testified that Deputy Murphy continued to punch him in the head when Deputy Carter and Deputy Cruz re-entered the cell and after he was handcuffed. *Id.* at 68. When Plaintiff saw Deputy Cruz re-enter his cell, he recalls saying "Look, Officer Cruz, I'm not resisting; I'm not resisting; I'm laying on the floor and no[t] resisting." *Id.* at 69. Meanwhile, Officer Murphy continued to punch Plaintiff in the head while Plaintiff was telling and showing Officer Cruz that he wasn't resisting. *Id.* at 69. Plaintiff stated that finally Deputy Carter and Deputy Cruz told Deputy Murphy to "get off the dude and get out of the cell." *Id.* at 69-70. Plaintiff estimated that Deputy Murphy struck him more than ten times with six or seven of the blows being to his face. *Id.* at 74. Plaintiff testified he did not strike Deputy Murphy at all. *Id.* at 76.

Plaintiff testified that he received a second disciplinary for this instance that he thought was uncalled for. (Doc. 54-7, p. 88).[15] Had he struck Deputy Murphy in the face, Plaintiff states he would have been charged with assault on a police officer and left in red and white stripes. *Id.* at 81. Instead, he states that after the month long investigation was completed, he was taken out of red and white stripes and put back into population. *Id.* at 81-82.

He was ultimately found guilty by Sergeant Lira at a disciplinary hearing held on the same day, August 12, 2016, and given up to 30 days of disciplinary segregation, forty-five days to be served in disciplinary separation, and loss of privileges including

---

[15] The resolution of these disciplinary charges was not addressed by the parties.

commissary, games, telephone, and visitation. (Doc. 54-5, p. 6). During the hearing, Plaintiff reiterated that he had used obscenities towards Deputy Murphy during the incident that morning, who quickly re-entered the cell, slammed Plaintiff to the ground, and said that Plaintiff was "his b---- and that he would f--- me like a b----" and then handcuffed him. *Id.* at 7. Plaintiff also said a Prison Rape Elimination Act (PREA) investigation would take place. *Id.*

Plaintiff was examined on August 12, 2016, by a nurse following the altercation. Plaintiff testified that as a result of Deputy Murphy's conduct, he sustained a knot on the right side of his forehead, knots all over the sides and back of his head, bruising to his forearms, a cut on his eyebrow, and his eyes were swelling. (Doc. 54-7, pp. 77-78, 83). Plaintiff also stated he started having headaches and seizures that he attributes to the head injury. *Id.* at 78. Plaintiff testified that both Deputy Halez and Sergeant Lira took pictures of his injuries.[16] *Id.* at 77; *see also* Doc. 54-3, p. 13. The jail medical file contained in the record documents that Plaintiff had three knots on his face: one on his left forehead; one to the right upper jaw; and one on his right forehead. He complained of pain to the right upper jaw and, as noted above, was given Ibuprofen. (Doc. 54-3, p. 13).

Plaintiff also asked to see a sergeant because he wanted to report that he had "been threatened with sexual assault" by Deputy Murphy. (Doc. 54-7, p. 70). He was told that it would be reported to Sergeant Lira and he would conduct an investigation. *Id.*

---

[16] Plaintiff maintains he was denied access to these photos and believes Defendants did not preserve them because the photos showed his injuries. (Doc. 81, pp. 13, 16). However, Plaintiff has described his injuries and there is no dispute that he suffered the physical injuries he described.

Plaintiff testified Sergeant Lira did not follow "proper protocol on a PREA investigation." *Id.* at 79. Plaintiff believes a proper investigation would have included reporting the incident to the state police since Plaintiff was sentenced to the ADC and was being held for them. *Id.* at 92. Plaintiff testified the state police would have handled the PREA investigation from there. *Id.* at 92-93. Plaintiff knows Sergeant Lira did not do this because Plaintiff's family contacted the state police and were told that they had not been contacted to do an investigation. *Id.* at 93. Plaintiff also contends the BCDC was required by PREA to maintain a hotline for inmates and it had no such hotline. (Doc. 81, pp. 13, 15).

Plaintiff concedes he was wrong and should have followed Deputy Murphy's orders and sat down at the table. (Doc. 54-7, p. 72). However, Plaintiff maintains that his failure to follow orders did not give Deputy Murphy the "right to come back into my cell and punch me in the face." *Id.* In fact, Plaintiff contends Deputy Murphy should not have been allowed to come into his cell at all on August 12, 2016. *Id.* at 79.

On August 13, 2016, Plaintiff asked to speak to Lieutenant Martinez about his sentence. Plaintiff stated he was given "excessive punishment" and there were "many mistakes" on the statements used to support the disciplinary charges. (Doc. 54-4, p. 12). Plaintiff indicated he had appealed the mistakes but did not notice the excessive punishment issue until after the appeal. *Id.* Lieutenant Martinez responded that he would talk to him the following day but that what Plaintiff was claiming was wrong. *Id.* According to Plaintiff, the maximum disciplinary segregation for each disciplinary was thirty days. (Doc. 54-7, p. 85). He testified he was given forty-five days in the hole on

each disciplinary, a total of ninety days, when it should have only been sixty days. *Id.* Plaintiff concedes he served only "thirty-something" days and was sent back to population and received his property back at that point. *Id.* at 87.

On August 15, 2016, Plaintiff asked to speak with Lieutenant Holt because he was physically and sexually assaulted on August 12, 2016. (Doc. 54-4, p. 15). He asked for lie detector tests to be performed on him and all deputies who had been there. *Id.* Plaintiff also asked to speak with the state police about the incident. *Id.* Finally, Plaintiff stated there were many errors on his disciplinary charges. *Id.* S. Darner responded that he would have the jail investigator speak with the Plaintiff about his claims. *Id.*

Plaintiff testified that Major Guyll and Sheriff Gilbert were named as defendants because they are supervisors and responsible for the training of the officers involved in the incidents. (Doc. 54-7, p. 94). They were not present during any of the incidents and Plaintiff never spoke to them about the incidents. *Id.* at 94-95. Plaintiff testified he did ask Sergeant Lira if he could speak to them but his request was denied. *Id.* at 95.

## II. LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997).

The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the

24

Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional as mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 336 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

## A. The Medical Defendants' Motion for Summary Judgment

The Medical Defendants contend they are entitled to summary judgment, for both the individual and official capacity claims asserted against them.

## 1. Applicable Legal Principles

The Eighth Amendment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "This principle extends to an inmate's mental health-care needs." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (citations omitted). The Eighth Circuit applies the deliberate indifference standard to both pretrial detainees and convicted inmates. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (explaining that courts apply the deliberate indifference standard used for Eighth Amendment claims to a pretrial detainee's claim of insufficient medical care notwithstanding the fact that the detainee's right to medical care arises under the Due Process Clause of the Fourteenth Amendment).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that his e suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence." *Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008) (internal citation omitted); *see also Jackson*, 756 F.3d at 1065. "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii*, 512 F.3d at 499.

It is also well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany*, 132 F.3d at 1239. Moreover, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as

each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011) (cleaned up); *see also Jackson v. Riebold,* 815 F.3d 1114, 1119-20 (8th Cir. 2016).

Thus, an "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson,* 603 F.3d at 449. Notwithstanding this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

As for the official capacity claims, a Plaintiff "seeking to impose liability on a municipality [or an institution] under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson,* 571 F.3d 814, 817-18 (8th Cir. 2009)

(citation omitted); *see also Jenkins*, 557 F.3d at 633 (Plaintiff must point to "[an] officially accepted guiding principle or procedure that was constitutionally inadequate").

## 2. Individual Capacity Claims

There is no dispute that Plaintiff suffered from serious mental health needs. The dispute here centers on whether the Medical Defendants exhibited deliberate indifference to those needs.

Plaintiff contends his rights were violated in the following ways: he was not given an intake visit; he was not given his mental health medication in a timely manner; he suffered withdrawal symptoms from not being given Klonopin; he was given Trazodone differently than prescribed by his private physician; he did not receive Lithium until he had suffered a mental health episode; his allergy to Lithium was not addressed in a timely manner; and his medication was passed out by untrained deputies.

With respect to the lack of an intake visit, the Court will assume, for purposes of this motion, that Plaintiff did not refuse an intake screening.[17] Plaintiff brought no medication to the jail with him. He did list the medication he was taking on the medical questionnaire. Nurse Ray took steps to verify his medication by asking his family to bring his medication to the jail and by working with Plaintiff and his family to obtain his medical records. Plaintiff did not submit his first medical request until July 18, 2016. Neither this request nor any other request submitted by Plaintiff made any mention that

---

[17] Although the Court mentions below how the record evidence indicates that the Medical Defendants responded to all of Plaintiff's medical needs (including trying to acquire medicine for him that he had been taking prior to incarceration), the Court would note at the outset that there is no constitutional right to an intake examination. *See, e.g., Shook v. Bd. of Cnty. Comm'rs of El Paso*, 216 F.R.D. 644, 648 (D. Colo. 2003), *rev'd on other grounds*, 386 F.3d 963 (10th Cir. 2004).

he suffered withdrawal as a result of not having his Klonopin. He never asked to be seen because of any withdrawal symptoms he was suffering. In short, his booking medical questionnaire was reviewed and steps were taken to verify his medication through his medical records. Thus, there is no evidence of deliberate indifference due to the lack of an intake visit.

Plaintiff also maintains that his mental health needs were not addressed in a timely manner. He alleges that this adversely impacted his behavior and resulted in his having a mental health episode on August 11, 2016. The record shows that on July 18, 2016, Plaintiff asked why he was not receiving the medication his family brought to the jail. Nurse Ray promptly responded that the only medication dropped off was Plaquenil and the discontinue date of the medication was May 15, 2016. Once Plaintiff advised the Medical Defendants that he was taking the medication for a skin condition, Plaquenil was prescribed for him the following day. The record also indicates that Nurse Ray and Plaintiff's family continued to work at getting his medical records.

On July 27, 2016, Dr. Saez prescribed Trazodone for depression and anxiety. Plaintiff objected to the prescription because he was being given the medication in the morning instead of the evening as ordered by his private physician. He also contends he was given the medication to help him sleep and not for depression and anxiety. The medication was discontinued on July 28, 2016. That same day, his blood was drawn and, when received, the results were sent to Plaintiff's private physician.

On August 12, 2016, Plaintiff was prescribed Lithium. Plaintiff suffered an allergic reaction and the Lithium prescription was discontinued. On August 22, 2016, he was

prescribed Zyprexa and the dosage was ultimately increased on two occasions. Plaintiff's other medical requests were addressed promptly and he was prescribed medication including Flexeril and Ibuprofen.

While there was some delay in obtaining or prescribing Plaintiff's mental health medication, the delay does not constitute evidence of deliberate indifference. The summary judgment record establishes that steps were being taken to verify his mental health diagnoses and his prescriptions for mental health medications. Medical authorizations were obtained from Plaintiff and either sent to the medical care providers or provided to the family to obtain the records.

Plaintiff also argues that his rights were violated when he was in segregation and his medication was provided to him by an untrained deputy instead of the nurse. This does not state a claim of constitutional dimension. *See, e.g., McClain v. Howard*, 2015 WL 6123063, at *9 (W.D. Ark. Sept. 21, 2015) (claim that medically trained staff do not pass out medication fails to state a claim of constitutional dimension); *Daniel v. George*, 2015 WL 3970787, at *4 (M.D. Tenn. June 29, 2015) (fact that guards were distributing medication did not state a constitutional claim); *Booker v. Herman*, 2006 WL 2457230, at *5 (N.D. Ind. Aug. 22, 2006) ("While it might be a good practice, tradition, or even state law to require that only medical staff can deliver medication, the Constitution does not prohibit guards from distributing medication to inmates. This allegation states no claim upon which relief can be granted.").

The Medical Defendants are entitled to summary judgment on all individual capacity claims asserted against them.

### 3. Official Capacity Claims

The Medical Defendants contend they are also entitled to summary judgment on the official capacity claims. The Court agrees.

As discussed above, "[o]fficial-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by a government's policy or custom." *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006) (citation and internal quotation marks omitted). Here, Plaintiff points to the existence of no such policy or custom that was the motivating factor behind the alleged deprivations of his constitutional rights. There are no genuine issues of material fact as to the Medical Defendants' official capacity liability. Thus, the Medical Defendants are entitled to summary judgment on the official capacity claims asserted against them.

All of the claims asserted against the Medical Defendants are, therefore, **DISMISSED WITH PREJUDICE**.

### B. The County Defendants' Motion for Summary Judgment

The County Defendants contend they are entitled to judgment in their favor for the following reasons: (1) there is no proof of any personal involvement by Sheriff Gilbert or Captain Guyll; (2) the force used by Deputy Murphy was reasonable in light of the circumstances; (3) Plaintiff was provided with Due Process; (4) Sergeant Dowyer did not fail to train or supervise; (5) Defendants are entitled to qualified immunity; and (6) there is no basis for official capacity liability. The Court considers each reason in turn.

**1. Individual or Supervisory Liability on the part of Sheriff Gilbert, Captain Guyll,**

**or Sergeant Dowyer**

Plaintiff contends Sheriff Gilbert, Captain Guyll, and Sergeant Dowyer are liable because they are supervisors over the Defendants involved in the incidents. A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 654, 694 (1978). "A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes,* 21 F.3d 277, 280 (8th Cir. 1994); *see also Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997) (noting that "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006)).

No such personal involvement is alleged to exist here. In fact, at least with respect to Sheriff Gilbert and Captain Guyll, Plaintiff concedes they were not personally involved in any the events forming the basis of his Complaint.

Absent direct personal participation, a supervisor may be held individually liable only if:

> a failure to properly supervise and train the offending employee caused the deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the

offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

*Andrews v. Fowler*, 98 F. 3d 1069, 1078 (8th Cir. 1996) (citations omitted).

Plaintiff has made no showing of deliberate indifference or tacit authorization on the part of Sheriff Gilbert, Captain Guyll, or Sergeant Dowyer. Nor has Plaintiff made any showing that they had any notice that Deputy Murphy's training procedures or supervision were so inadequate that it was likely to result in a constitutional violation.

Sheriff Gilbert and Captain Guyll are entitled to summary judgment on all individual capacity claims asserted against them, and Sergeant Dowyer is entitled to summary judgment on all supervisory liability claims.

### 2. Use of Force by Deputy Murphy

Plaintiff was a pretrial detainee on the dates in question.[18] The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from "the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citation omitted). Any punishment of a pretrial detainee violates the Due Process Clause. *Edwards v. Byrd*, 750 F.3d 728, 732 n.2 (8th Cir. 2014). Any use of force is unconstitutional if the force was used to "injure, punish, or discipline" a detainee. *Id.* at 732. A use of force does not amount to unconstitutional punishment if it is "but an incident of some other legitimate governmental purpose." *Bell v. Wolfish*, 441 U.S. 520, 535, 538 (1979).

---

[18] The summary judgment record establishes that Plaintiff's parole revocation did not occur until August 17, 2016. (Doc. 54-2, p. 2).

33

"We analyze the excessive force claims of pretrial detainees under an objective reasonableness standard." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015)). In determining whether a given use of force was reasonable or excessive, the Court in *Kingsley* said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 135 S.Ct. at 2473. The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id.* "We must assess the actions of each officer from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Ryan*, 850 F.3d at 427 (internal quotation marks and citation omitted).

With respect to the incident occurring in the control pod on August 11, 2016, there are no genuine issues of material fact as to whether Deputy Murphy used excessive force. The video shows that Plaintiff was becoming agitated, was failing to keep his hands behind his back, and when Deputy Carter stepped forward with the handcuffs, Plaintiff came off the wall and turned towards him abruptly and threw his arms up in the air. Plaintiff was taken to the ground and held there until he was handcuffed. There is no indication that more force was used than necessary to obtain and maintain control of the Plaintiff.

However, with respect to the incident in Plaintiff's cell on August 12, 2016, viewing the evidence in the light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact as to whether Deputy Murphy used excessive force against the Plaintiff. The video of that incident does not show what occurred within the cell. However, it is undisputed that Plaintiff suffered physical injuries as a result of Deputy Murphy's use of force. What the Court is left with are contradictory versions of what occurred in the cell—one advanced by Deputies Murphy, Carter, and Cruz, and a competing version advanced by the Plaintiff. Because of these genuine issues of material fact, the Court must deny summary judgment to Deputy Murphy as it relates to this incident.

With respect to Deputy Murphy's use of sexually offensive language on August 12, 2016, and his alleged threat of further force on August 11, 2016, these incidents do not rise to the level of a constitutional violation. Taunts, name calling, and the use of offensive language do not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983). Similarly, verbal threats do not constitute a constitutional violation. *Martin v. Sargent*, 780 F.2d 1334, 1139 (8th Cir. 1985) (being called an obscene name and threatened with adverse consequences for failure to follow an order does not state a claim of constitutional dimension); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (verbal threats and abuse by jail officials did not rise to the level of a constitutional violation).

Deputy Murphy is entitled to summary judgment on all claims **except** the claim stemming from the incident that occurred in the Plaintiff's cell on August 12, 2016.

### 3. Claims against the Remaining Defendants

Plaintiff contends his rights were violated by the fact that Sergeant Dowyer was present on August 12, 2016, and did not fill out an incident report. This claim is without merit. Incident reports were completed by the three deputies who were in the cell or at the doorway when the force was used. Sergeant Dowyer is merely one of the many officers who responded to the call for assistance. She did not witness the use of force.

Next, he contends Sergeant Dowyer and Corporal Kemp are constitutionally liable because they made the decision not to give him his property for the period of time from the incident on August 11, 2016, when he was put on lock down pending his disciplinary hearing, until his disciplinary hearing on August 12, 2016. Plaintiff concedes he was not entitled to have his property after he was found guilty at the disciplinary hearing. The deprivation of property for this short period of time does not state a claim of constitutional dimension.

Even if we assume the deprivation was wrongful, no Due Process claim is stated. When an individual is intentionally deprived of his personal property, the Supreme Court has held that due process is satisfied if the individual has adequate state post-deprivation remedies. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (intentional deprivation of property does not violate due process when meaningful post-deprivation remedy is available). In this case, a post-deprivation remedy is available because Arkansas recognizes a cause of action for conversion. *Elliot v. Hurst*, 307 Ark. 134, 138

(1991) (cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right).

Plaintiff also contends Corporal Kemp threatened him following the August 11, 2016, incident when he was being moved to E-pod. Specifically, Plaintiff maintains Corporal Kemp threatened to beat him if he found out Plaintiff had swung on one of his officers. As noted above, verbal threats do not state a claim of constitutional dimension.

With respect to Sergeant Lira, Plaintiff contends he failed to conduct a proper PREA investigation. PREA does not establish a private right of action and Plaintiff cannot use the requirements of the PREA statute to establish deliberate indifference on the part of Sergeant Lira. *See, e.g., Bowens v. Wetzel*, 674 Fed. Appx. 133, 137 (3d Cir. 2017) (noting that there was no private cause of action under the PREA and that a plaintiff "may not attempt to enforce statutes that do not themselves create a private right of action by bootstrapping such standards into a constitutional deliberate indifference claim").

Sergeant Dowyer, Corporal Kemp, and Sergeant Lira are entitled to summary judgment on these claims.

### 4. Due Process in connection with the Disciplinary Hearing

Plaintiff contends Sergeant Lira and Lieutenant Martinez are liable for having sentenced him for more than thirty days of disciplinary lock down following the disciplinary hearing. The Supreme Court set forth the Due Process requirements for disciplinary hearings in the case of *Wolff v. McDonnell*, 418 U.S. 539, 556, 563 (1974). The Court held that a prisoner was entitled to receive "(1) advance written notice of the

disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). There must also be some evidence supporting the finding of guilt. *Id.* Here, Plaintiff's sole challenge is to the sentence he received.

Any claims concerning Plaintiff's disciplinary charge conviction and sentence are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a claim for damages for "allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" is not cognizable until "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. The Court noted that if a successful claim would not demonstrate the invalidity of an outstanding criminal judgment, it should be allowed to proceed. *Id.*

The *Heck* doctrine applies to inmate disciplinary proceedings. *Edwards v. Balisok*, 520 U.S. 641 (1997); *Portley-El v. Brill*, 288 F.3d 1063 (8th Cir. 2002). An inmate's challenge to the validity of a disciplinary conviction is barred by *Heck*. *Edwards*, 520 U.S. at 646-48. Thus, *Heck* requires favorable termination of the disciplinary charge "in an authorized state tribunal or a federal habeas court, even if the claim is for damages rather than earlier release." *Sheldon v. Hundley,* 83 231, 233 (8th

Cir. 1996); *Cincoski v. Richard*, 418 Fed App'x 571, 571-72 (8th Cir. 2011) (Plaintiff's claims regarding his disciplinary convictions, including restoration of good-time credits, declaratory relief, and damages based on those convictions were *Heck*-barred.)

Sergeant Lira and Lieutenant Martinez are entitled to summary judgment on this claim.

### 5. Qualified Immunity

Having found that the facts do not make out a constitutional violation as to all Defendants except Deputy Murphy, the remaining Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right, the Defendant is entitled to qualified immunity). Additionally, Deputy Murphy is entitled to qualified immunity as to the August 11, 2016, incident. However, the Court must still consider whether Deputy Murphy is entitled to qualified immunity for the incident in Plaintiff's cell on August 12, 2016.

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989).

To survive a summary judgment motion on qualified immunity grounds, the Plaintiff must establish that there is a genuine issue of material fact as to whether Deputy Murphy violated his clearly established constitutional rights. *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996). Two inquiries are required in analyzing a claim of qualified immunity: (1) do the "facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional rights;" and (2) was the "right clearly established as of [the date of the alleged violation], such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

As discussed above, with respect to the August 12, 2016, incident, the facts as reported by Plaintiff establish a violation of his right to be free from the excessive use of force. Plaintiff maintains that he was not resisting and despite this Deputy Murphy continued hitting him. The right of a pretrial detainee to be free from the use of excessive force under such circumstances was clearly established in 2016. *See, e.g., Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014) (clearly established that the use of force against a pretrial detainee who was not resisting or being aggressive was unconstitutional under the Fourteenth and Eighth Amendments); *United States v. Miller*, 477 F.3d 644, 647-48 (8th Cir. 2007) (holding that kicking and stomping on an inmate without just cause or reason would violate the Eighth Amendment). Of course, the County Defendants deny Plaintiff's version of the facts. But, just as in *Edwards*, the video evidence does not show the inside of Plaintiff's cell—where the conduct at the heart of this claim occurred—and therefore cannot either confirm or refute Plaintiff's

evidence (including his testimony that he was not resisting and the undisputed fact that Plaintiff suffered injuries stemming from the incident). As a result, material fact issues remain as to Deputy Murphy's conduct given that the Court is left with competing versions of what happened in Plaintiff's cell on August 12, 2016, both of which are supported by evidence in the record.

Therefore, because Plaintiff has alleged sufficient facts that, when construed in the light most favorable to him, would make out a violation of a right that was clearly established at the time of the incident, the Court must deny Deputy Murphy's motion for summary judgment on the basis of qualified immunity.[19]

### 6. Official Capacity Liability

As noted above, a governmental entity can only be held liable if the alleged constitutional injury results from a policy or custom. *Monell*, 436 F.3d at 691. Here, Plaintiff has pointed to no policy or custom that was the motivating factor behind the alleged constitutional violation.

Official capacity liability can also be based on a failure to train or supervise the offending actor who caused the deprivation. *Audio Odyssey, Ltd. v. Brenton First Nat'l. Bank*, 245 F.3d 721, 742 (8th Cir. 2001). In *Parrish v. Ball*, 594 F.3d 993 (8th Cir. 2010), the Court set forth the requirements for liability for failure to supervise. For officials to be

---

[19] The Court further notes, mainly for the parties' reference, that although the denial of qualified immunity is ordinarily subject to interlocutory appeal, when such a denial turns on a question of evidence sufficiency—as it does here—the Court of Appeals will lack jurisdiction to rule on the issue. *See Kahle v. Leonard*, 477 F.3d 544, 549 (8th Cir. 2007). "Put another way, if the issues relate to whether the actor actually committed the act of which he is accused . . . [the Court of Appeals] ha[s] no jurisdiction to review them in an interlocutory appeal." *Id.* (quotation marks and citation omitted).

held liable on the basis of a failure to supervise, the Plaintiff must show the supervisory official: "1) Received notice of a pattern of unconstitutional acts committed by subordinates; 2) Demonstrated deliberate indifference or tacit authorization of the offensive acts; 3) Failed to take sufficient remedial action; and 4) That such failure proximately caused injury to [Plaintiff]." 594 F.3d at 1002 (citations omitted). Here, "there is no showing of previous illegalities [on the part of Deputy Murphy] that [placed the supervisory officials] on the requisite notice." *Audio*, 245 F.3d at 742. Thus, any official capacity liability claim based on a failure to supervise claim fails.

A local government may also be held liable for the failure to train its employees "where (1) the [county's] . . . training practices were inadequate; (2) the [county] was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by [the county]; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Parrish*, 594 F. 3d at 997 (cleaned up). To satisfy this standard, Plaintiff must show more than that a single officer was unsatisfactorily trained, he must demonstrate

> that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton, Ohio*, 489 U.S. 378, 390 (1989).

Plaintiff has made no such showing here. He just asserts that Deputy Murphy used excessive force against him on two occasions and threatened him with sexual assault during one of those events. This falls far short of making the showing required by the Supreme Court to establish liability on behalf of Benton County.

The County Defendants are entitled to summary judgment on all official liability claims.

## IV. CONCLUSION

The Motion for Summary Judgment (Doc. 49) filed by Dr. Saez, Nurse Ray, and Nurse Smith is **GRANTED** and all claims against them are **DISMISSED WITH PREJUDICE.**

The Motion for Summary Judgment (Doc. 52) filed by the County Defendants, Sheriff Gilbert, Lieutenant Martinez, Sergeant Lira, Deputy Murphy, Corporal Kemp, Sergeant Dowyer, and Major Guyll, is **GRANTED IN PART AND DENIED IN PART.** Specifically, it is granted with respect to all claims against Sheriff Gilbert, Lieutenant Martinez, Sergeant Lira, Corporal Kemp, Sergeant Dowyer, and Major Guyll. The motion is denied with respect to the claim against Deputy Murphy in his individual capacity based on the August 12, 2016, incident. Deputy Murphy is, however, entitled to summary judgment with respect to the August 11, 2016, incident.

The excessive force claim against Deputy Murphy in his individual capacity stemming from the August 12, 2016, incident will be set for trial.

**IT IS SO ORDERED** on this _20th_ day of February, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE