IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL SHANE WILMOTH                                                                PLAINTIFF

v.                                    CASE NO. 5:16-CV-5244

DEPUTY AUSTIN MURPHY                                                                 DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court is a Motion for Relief Regarding Spoliation (Doc. 144) filed by Plaintiff Michael Shane Wilmoth. Defendant Deputy Austin Murphy has filed a Response in Opposition (Doc. 146). The Court subsequently held a phone conference during which it gave the parties a chance to file supplements to their previous filings. Defendant filed a Supplement (Doc. 151) and a second Supplement (Doc. 152), and Wilmoth filed a Reply in support of his motion (Doc. 158). For the reasons stated herein, the Motion is **GRANTED**.

## I. BACKGROUND

The facts of this case have already been recounted in much greater detail in the Court's opinion on summary judgment (Doc. 90). As such, the Court will repeat here only those facts necessary to give context for the Court's current ruling.

Following the Court's order on summary judgment, the sole remaining claim in this case is Wilmoth's claim of excessive force against Deputy Murphy for an incident on August 12, 2016 in Wilmoth's cell. Of course, the facts surrounding that confrontation are disputed, but it is undisputed that Wilmoth sustained at least some bruising following the event. As such, and pursuant to the admitted standard operating procedures at the time, Deputy Zachary Hale took photographs of Wilmoth and his injuries using his personal cell

1

phone,[1] which were to be used in the resulting investigation of the incident.[2] And, in fact, Sergeant Lira made specific mention of these photographs in his resulting report. (Doc. 145-3). However, contrary to the apparent usual practice of the Benton County Detention Center, those photographs were either 1) never uploaded to the jail's internal incident reporting system or 2) were uploaded and were subsequently misplaced or deleted.[3] These photographs were also never produced to Wilmoth at any point during discovery. Wilmoth now claims that this evidence was intentionally destroyed or made unavailable to him by the defendant. As such, he requests an adverse inference instruction based on spoliation of evidence. While the Court concludes that sanctions—including an adverse inference instruction—are appropriate, it does so based on this defendant's lack of candor in the discovery process and his repeated failure to answer Wilmoth's simple discovery requests. In short, the Court finds that defendant's[4] conduct in this case was designed to deprive Wilmoth of the use of these photographs in litigation.

---

[1] According to Deputy Hale, officers of the Benton County Detention Center were not yet equipped with official work phones they could use to document/photograph incidents that occurred during their shifts.

[2] As discussed in the Court's prior Opinion and Order (Doc. 90), because of Murphy's alleged words and actions on that day, Wilmoth alleged sexual assault and wanted the jail to launch a Prison Rape Elimination Act (PREA) investigation, which it ultimately did.

[3] Deputy Hale testified that procedure would have required that he produce the photographs he took on his cell phone to Sergeant Lira, the internal affairs investigator, and that policy would further require that such photographs be uploaded to the internal system ("JMS") either by the person who took the photographs or by the official conducting the investigation.

[4] Defendant's counsel also represented the remaining county defendants until those defendants were dismissed at summary judgment. She was also the individual who sent a letter informing the county and its officials of the duty to preserve evidence. Finally, she was also the individual who repeatedly asserted in filings that she had, on behalf of defendants (including Defendant Murphy) produced the complete file to Wilmoth. As the

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 37(e) provides sanction options for a court when a party fails to take reasonable steps to preserve electronically stored information. Under that Rule, if such evidence cannot be replaced through additional discovery, the Court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

F.R.C.P. 37(e)(1), (2)(A)-(C).

## III. DISCUSSION

Before a Court can impose sanctions under Rule 37, it must first determine that the party had a duty to preserve electronically stored information. In this case, that proof is abundant. On December 7, 2016, the county defendants filed an Answer in this case (Doc. 12). The following day, counsel for these defendants, JaNan Davis, issued a litigation hold letter entitled "Duty to Preserve Evidence" to Sheriff Gilbert, Major Guyll, and Capt. Hahn of the Benton County Jail. The letter, in bold print, acknowledges that "[w]e have a duty to act now to gather and preserve relevant evidence." (Doc. 145-7). It additionally requested that the County "preserve all other records or recordings or documents that might **in any way be relevant to the events that form the factual basis**

---

Court will detail below, that representation was false when it was made, and remains false today.

**for the allegations in the Complaint**." *Id.* (emphasis added). It finally advised the County that "if we allow evidence to spoil (be deleted or discarded), then we (you and us) may be subject to sanctions by the Court." *Id.* As such, it recommended that the County "store the data on your county computer and do not let it get lost or erased." *Id.* Additionally, the Court's initial scheduling order directed that, within 45 days, Defendants were to provide Wilmoth with "a copy of all incident reports documenting incidents referenced in the Plaintiff's complaint, including any color photographs." (Doc. 25, p. 1). As such, defendant was clearly on notice—both through his own attorney and court orders, that he was under a duty to preserve documents relevant to the incidents recounted in Wilmoth's complaint.

Next, the Court must determine whether the party took reasonable steps to preserve the relevant evidence and whether the party's actions in this case support a finding that the party acted with the intent to deprive another party of the information's use in the litigation. As to the efforts expended to preserve the relevant evidence, the Court finds that none of the defendants exercised reasonable diligence in this case to preserve this evidence. Both Deputy Hale (who took the photographs as part of the resulting investigation) and Sergeant Lira (the internal affairs investigator who was tasked with reviewing the incident) admitted that photographs of Wilmoth's resulting injuries did in fact exist. Further, both testified that standard procedure at the jail at the time would have been to upload those photographs into the internal JMS system for preservation. Moreover, Sergeant Lira apparently thought that the pictures were so important to the investigation that he needed to mention them in his report. Yet, at no point did he ever feel the need to ensure that these photographs were uploaded into the internal system or, at a minimum, attached and incorporated into his report. While the Court has

previously been led to believe that Sergeant Lira viewed the photographs on Deputy Hale's phone, Sergeant Lira testified that, given the nature of this investigation (PREA/sexual assault), it is not likely that he would only have looked at the photographs on an officer's phone. Accepting Sergeant Lira's words at face value, that means that the photographs of Wilmoth were likely uploaded into the JMS system. That fact, however, is even *worse* for the defendant, because they certainly at that point would have been clearly encompassed within the material that was—or should have been—protected from alteration or deletion by the litigation hold. Given the deposition testimony before the Court, it has little before it which would suggest that any of the county defendants—including Deputy Murphy—or their counsel, took seriously their obligation to ensure that relevant evidence was preserved.

Rather, as the Court will now explain, the evidence as a collective whole indicates that there were many times when defense counsel buried her head in the sand in this case and never fully committed to producing this evidence or discovering where it was. As the Court will note, that includes conduct which might readily be viewed as intentional deception before this court. In order to document the full history of incomplete, evasive, or untrue discovery responses that, taken as a whole, indicate this defendant's (and the former county defendants') intent to deprive Wilmoth of these materials, it is necessary to detail the long line of filings that brings us to the present motion.

From the inception of this litigation on September 12, 2016 when Wilmoth filed his complaint against Deputy Murphy and the county co-defendants, Wilmoth has attempted to acquire the photographs that he knows were taken of him following the incident with Deputy Murphy only a month prior on August 12, 2016. In particular, on January 9, 2017,

5

he served his first set of discovery on defendants. In Request for Production No. 3 and Request for Production No. 4, he specifically requested "all photos taken of the Plaintiff" by Corporal Hale and Sergeant Lira concerning the incident with Deputy Murphy. (Doc. 27-1, p. 2). In response, defendant reported that "no photos have been located." *Id.* On April 13, 2017, and in accordance with this Court's initial scheduling order, defendant filed a Notice of Disclosures acknowledging that he had been directed, as early as the initial scheduling order, to produce all incident reports referenced in the complaint along with any photographs that were taken. (Doc. 32). In that same Notice, Ms. Davis, on behalf of the county defendants, indicated that they had faithfully complied with this order. In their filing, they specifically noted that Wilmoth had been provided with a copy of his deposition transcript and that they were currently "unaware of any other documents, photographs, or video footage which relates to the facts giving rise to Plaintiff's claims." (Doc. 32, pp. 1-2). They further requested that, should Wilmoth "be aware of or suspect any such documents, photographs, and/or video footage, if he will describe those items with as much particularity as possible, **Defendants will attempt to locate those items**." *Id.* at p. 2 (emphasis added).

Because Wilmoth had already indicated the photographs he was seeking in his earlier set of discovery, he took defendants up on their offer by filing no fewer than four separate motions to compel, specifically highlighting Sergeant Lira's report's mention of the pictures he was looking for—i.e., those taken by Deputy Hale. Nevertheless, he was never provided with these photographs, nor does it ever appear that defendant or defense counsel (who again at this time represented the county as well) ever investigated these missing photographs. We know this because during the Court's hearing almost a year

and a half later, the Court specifically asked defense counsel when she first became aware of photographs that Deputy Hale allegedly took on his cell phone of Wilmoth's injuries. Her response: this morning. Then, when the Court further inquired about her efforts, she explained that there was nothing she could do to obtain those photographs because that had not been made an issue until just then. Given her representations, it is clear that she did not, on behalf of any of the defendants, conduct a thorough inquiry into the whereabouts of these photographs—despite the fact that they were the subject of repeated motions to compel beginning as early as March 8, 2017. If she had, her response to the Court, some nineteen months later, would certainly not have suggested that this was a new issue.

To the extent that the four separate motions to compel left any doubt about her knowledge of these photographs or of Wilmoth's request for such evidence, Ms. Davis and all defendants were certainly put on notice of Wilmoth's requests for these photos as early as **April 5, 2017** when Ms. Davis took his deposition. During that deposition, he referenced these photos at least three times, including one time where he expressly accused her and the county of refusing to give them to him. (Doc. 152, p. 76). Yet, despite this early knowledge that pictures were missing and his repeated requests for those pictures, she represented to him and to the Court (in responding to his motions to compel) that defendants had "complied with Plaintiff's discovery requests and have produced a complete file to Plaintiff." (Doc. 36, ¶ 5). And then, over a year later, she again represented to the Court that she had never had any idea before October 2018 that these photographs were in issue. The record belies her statements. Taken together, Ms. Davis's conduct on behalf of defendant Murphy in this case indicates a clear lack of faithful compliance with

this Court's orders or his duty to preserve evidence. Given the number of times that defendant and Ms. Davis were presented with—and failed to take advantage of—opportunities to learn where these photographs were, the Court has little hesitation concluding that Deputy Murphy's discovery conduct throughout this case evinces a clear intent to deprive Wilmoth of the use of these photographs.

And, the record also confirms that, but for this insufficient (or non-existent) investigation into the whereabouts of these photographs, Wilmoth would likely not have been deprived of such evidence at trial. For, after the Court granted Wilmoth a continuance and allowed a limited reopening of the discovery window, the Court learned through subsequent depositions that the photographs were indeed taken on Deputy Hale's cell phone. Moreover, although Deputy Hale still has this cell phone, the contents have apparently been rendered unusable because, at some point in mid-spring or early summer of 2018, the charging port of the phone was corrupted, and the contents are allegedly not recoverable. Thus, had defendant or his counsel commenced an investigation into the whereabouts of these photographs at any point from **January 2017** when Wilmoth first served his request for production through mid-2018, the record shows that it is likely that they would have discovered that Deputy Hale took the photographs on a personal cell phone and could have recovered those photos before the charging port malfunction occurred. Thus, to the extent the Court needs to make a finding of prejudice in order to impose the sanctions detailed below, it easily does so here.[5]

---

[5] Defense counsel argues that Wilmoth cannot demonstrate prejudice because there are ample alternative sources he could rely on as evidence of his claimed injuries, including the other deputies who observed Wilmoth immediately following the incident. The Court joins those who have rejected such arguments as frustratingly myopic. *See, e.g.*, *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1111 (D. Az. 2014) ("The Court and Plaintiff can take no

8

For the reasons noted above, the Court finds that the following sanctions are appropriate. First, in light of Sergeant Lira's role in conducting the investigation into Wilmoth's sexual assault allegations, the Court finds it literally incredible to hear Lira explain that he does not remember what he did with the pictures that he acknowledged viewing in his report or why these photographs would not have been uploaded as a crucial part of his investigatory file in accordance with county policy. The Court finds that his actions in this case have severely undermined his credibility. Given his direct involvement in viewing and in failing to ensure preservation of these photographs, the Court finds that his actions demonstrate bad faith and that it would be appropriate to prevent the defendant from calling him as a witness in his case. The same sanction will also apply to Deputy Hale.[6] Hale admitted during his deposition that although standard policy would have already required him to preserve and upload these photographs to the system, he certainly should have done so here given the nature of Wilmoth's accusations against Deputy Murphy. Yet, he failed to take any reasonable steps to ensure preservation of the materials that he knew were crucial to the resulting investigation. Although the Court

---

comfort in Defendants' assertion that defense witnesses, who will favor the defense position, can testify about these events at trial."). In short, the contemporaneous photographs taken here, just like the video in *Pettit*, would have been objective evidence of Wilmoth's injuries devoid of any of the pro-defense leanings of defense witnesses or credibility problems of either party. The Court finds that this alternative evidence—to the extent it is permitted by this Order—would clearly have been inferior to such objective evidence.

[6] This sanction does not prevent Wilmoth from calling either of these officials in his case. To the extent he does so, however, these officials will be prohibited on cross-examination from testifying as to their recollection of Wilmoth's injuries, unless Wilmoth opens the door for such testimony through his own questions. Should Wilmoth believe that this sanction might somehow prejudice him or his trial strategy, he should feel free to raise this issue during the final pre-trial conference set for August 20, 2019.

recognizes that this sanction at first blush may seem harsh, it would be against the interests of justice to allow an official to testify about pictures which were not preserved, in part, because of that same official's failure to follow county policy. The fact that these two individuals were tasked with photographing the incident and investigating Deputy Murphy's actions makes their resulting conduct that much more egregious.

Second, under Rule 37(e)(2)(B) and in light of the Court's earlier finding that defendant and his counsel have willfully acted to prevent Wilmoth from accessing this documentary evidence that he claims would support his case, the Court will instruct the jury that it may, but is not required to, presume that the photographs in question would have supported Wilmoth's claimed injuries arising from his in-cell confrontation with Deputy Murphy and that the lack of such photographic evidence should not be held against Wilmoth in this case.

### IV. CONCLUSION

In light of the above discussion, the Court finds that the above-referenced sanctions are the most appropriate remedies to cure the prejudice Wilmoth has suffered because defendant and his counsel buried their heads in the sand and refused to comply with Wilmoth's repeated requests for such evidence or investigate why such evidence was not already in the files they obtained from the county.

**IT IS THEREFORE ORDERED** that Wilmoth's Motion for Relief Regarding Spoliation (Doc. 144) is **GRANTED** as described above.

**IT IS SO ORDERED** on this 7th day of August, 2019.

                                                /s/ *Timothy L. Brooks*
                                                TIMOTHY L. BROOKS
                                                UNITED STATES DISTRICT JUDGE